**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2158**

PAUL M. RETFALVI,

        Plaintiff - Appellant,

    v.

UNITED STATES OF AMERICA,

        Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (5:17-cv-00468-D)

Argued: May 8, 2019                            Decided: July 16, 2019

Before NIEMEYER and HARRIS, Circuit Judges, and Ellen L. HOLLANDER, United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Hollander wrote the opinion, in which Judges Niemeyer and Harris joined.

**ARGUED:** Robert H. Merritt, Jr., BAILEY & DIXON, LLP, Raleigh, North Carolina, for Appellant. Anthony T. Sheehan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Teresa E. McLaughlin, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert J. Higdon, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

HOLLANDER, District Judge:

This appeal resolves a challenge to the constitutionality of a treaty authorizing the United States to collect unpaid income taxes on behalf of Canada. The issue arises in the context of a tax refund action filed by appellant Paul M. Retfalvi, M.D., the taxpayer. He filed suit against the United States, seeking a refund of approximately $125,000 in taxes collected from him by the Internal Revenue Service ("IRS"), pursuant to the treaty, for income taxes that he owed to Canada for 2006.

Dr. Retfalvi advances several grounds in support of his challenge to the constitutionality of the treaty. According to Dr. Retfalvi, the treaty constitutes a "bill for raising revenue" that did not originate in the House of Representatives, in violation of the Origination Clause, Article 1, § 7, cl. 1. In addition, he argues that the treaty violates the Taxing Clause, Article I, § 8, cl. 1, which, in his view, confers on Congress the exclusive right to enact taxing legislation. Further, Dr. Retfalvi contends that the treaty is not self-executing and is therefore unenforceable, because it has not been validated by the requisite implementing legislation. Dr. Retfalvi also challenges the IRS's legal authority to collect a foreign assessment on behalf of Canada.

The District Court for the Eastern District of North Carolina rejected these contentions. We affirm.

# I.

## A.

In 1980, the United States and Canada executed the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital, U.S.-Can., Sept. 26, 1980, 1986-2 C.B. 258 (the "Treaty"). It was ratified by the U.S. Senate in 1984. Article 26 XXVIA ("Article 26A") was added to the Treaty by Article 15 of Protocol 3 and entered into force after the Senate ratified Protocol 3 in 1995. S. Treaty Doc. No. 104-4, 1984 WL 261890.

Under Article 26A, the United States and Canada agreed to assist each other with the collection of unpaid taxes. Article 26A, ¶¶ 1, 9. To apply for collection assistance, the applicant State submits a revenue claim to the requested State. *Id.* ¶ 2. The applicant State must certify that the revenue claim has been "finally determined" under its laws. *Id.* Of relevance here, "a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted." *Id.*

The requested State decides whether to accept the revenue claim. Article 26A, ¶ 3. If it accepts the revenue claim, it must collect the claim as though it were its own finally determined tax debt. *Id.* Therefore, a Canadian revenue claim accepted by the United States is "treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received." *Id.* ¶ 4(a). Any monies collected by the United States are forwarded to Canada. *Id.* ¶ 6.

3

The taxpayer retains any rights of review otherwise available under the applicant State's laws. However, under Article 26A, the taxpayer cannot seek administrative or judicial review by the requested State of the revenue claim of the applicant State. *Id.* ¶ 5.

The United States has construed Article 26A as a self-executing treaty. That is, Article 26A "'operates of itself without the aid of any legislative provision.'" *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quoting *Foster v. Neilson*, 27 U.S. 253, 314 (1829), *overruled on other grounds by United States v. Percheman*, 32 U.S. 51 (1833)); *see also ESAB Grp., Inc. v. Zurich Ins., PLC*, 685 F.3d 376, 387 (4th Cir. 2012) (noting that a treaty can have both self-executing and non-self-executing provisions).

**B.**

The taxpayer, Paul M. Retfalvi, is a medical doctor who was born in Hungary. He moved to Canada in 1988 under a restricted work permit, and he became a Canadian citizen in 1993. That same year, Dr. Retfalvi came to the United States on a J-1 visa to participate in a medical residency program. After Dr. Retfalvi completed his residency in 1997, he returned to Canada.

The following year, Dr. Retfalvi returned to the United States under an H1-B visa. To ensure that he would have a place to live if his H1-B visa was not renewed, Dr. Retfalvi purchased a small condominium in Vancouver, Canada and signed a pre-construction contract to purchase a larger one. Through extensions of his H1-B visa, Dr. Retfalvi continued to reside in the United States. In 2005, he was granted permanent resident status from the United States. As Dr. Retfalvi was no longer planning to reside in Canada, he sold both condominiums in 2006.

4

In 2007, Dr. Retfalvi and his wife filed separate Canadian income tax returns for 2006. Each return included one-half of the proceeds of the sale of the condominiums. Dr. Retfalvi and his wife also reported the sales on their joint federal income tax return, filed with the IRS.

The Canada Revenue Agency ("CRA"), which administers Canada's tax laws, audited Dr. Retfalvi's tax return in 2007. In 2008, the CRA sent Dr. Retfalvi a summary of the audit adjustments, finding that he had improperly reported the sale of the condominiums. The next year, the CRA sent him a Notice of Assessment.

In response, Dr. Retfalvi filed an untimely objection in February 2010. Thereafter, in March 2010, he filed a timely administrative appeal. Then, on June 23, 2010, Dr. Retfalvi became a United States citizen.

The CRA sent Dr. Retfalvi a Notice of Confirmation on July 4, 2011, denying his appeal and providing him 90 days to file an appeal with the Canadian Tax Court. However, Dr. Retfalvi did not challenge the proposed deficiency by the deadline of October 3, 2011. As a result, the Canadian tax liability became final on that date.

On October 27, 2015, the CRA referred the assessment to the United States for collection, pursuant to Article 26A. In turn, on November 16, 2015, the Internal Revenue Service ("IRS") issued a "Final Notice – Notice of Intent to Levy and of Your Right to a Hearing," instructing Dr. Retfalvi to pay $124,286.83 in U.S. currency to satisfy the Canadian revenue claim. In the Notice, the IRS advised that it intended to use its collection procedures if Dr. Retfalvi did not pay the assessment within the allotted period. Further, the Notice indicated that the taxpayer had 30 days to seek a hearing before the IRS Office

of Appeals regarding the proposed levy. However, the Notice stated that the IRS had no authority to adjust the underlying Canadian tax liability.

Dr. Retfalvi objected to the Notice on January 13, 2016, and requested a hearing. On February 23, 2016, he sought a hearing before the IRS Office of Appeals under the Collection Due Process Program, pursuant to Section 6330 of the Internal Revenue Code ("I.R.C." or the "Tax Code"). In response, Dr. Retfalvi was informed that he was not entitled to a hearing under that program, but he was entitled to a limited hearing under the Collection Appeals Program. Dr. Retfalvi then filed for that hearing.

On March 24, 2016, the IRS denied Dr. Retfalvi's "Collection Appeal Request," because the "Appeals Office does not have the authority to adjust a foreign tax liability." And, as noted, Dr. Retfalvi never challenged the existence or the amount of the Canadian tax claim.

Thereafter, in the Eastern District of North Carolina, Dr. Retfalvi filed suit for a declaratory judgment and injunctive relief to enjoin the collection of the tax. *See Retfalvi v. Comm'r*, 216 F. Supp. 3d 648 (E.D.N.C. 2016). But, the court dismissed the suit for lack of jurisdiction, pursuant to the Anti-Injunction Act, 26 U.S.C. § 7421(a), and the tax exception to the Declaratory Judgment Act, 28 U.S.C. § 2201(a). *Id.* Dr. Retfalvi did not appeal. Rather, he paid the tax assessment and then filed a refund claim with the IRS, which was denied.

Dr. Retfalvi's refund suit followed on September 14, 2017. It contains nine counts, of which five are relevant on appeal.[1] In Count I, Dr. Retfalvi claims that Article 26A violates the Constitution's Origination Clause, as a revenue raising measure that did not originate in the House of Representatives. In Count II, he maintains that Article 26A does not have the force of law because it is not a self-executing treaty provision. Counts III and V pertain to the Taxing Clause. In Count VI, Dr. Retfalvi asserts that the IRS is not authorized to collect taxes because Article 26A has no legal force.

The government moved to dismiss the suit under Fed. R. Civ. P. 12(b)(6). In a well-reasoned decision issued on August 15, 2018, the district court rejected all of the taxpayer's claims and concluded that the IRS had the authority to collect the assessment on behalf of Canada, pursuant to Article 26A. Therefore, the court dismissed the complaint. This appeal followed.

Dr. Retfalvi maintains that the district court erred in granting the government's Rule 12(b)(6) motion. Because this is an appeal from the disposition of a motion to dismiss, we consider the issue *de novo*. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for

---

[1] The remaining counts are not at issue on appeal.

7

'all civil actions' . . . ."). In resolving such a motion, a court "must accept as true all of the factual allegations contained in the complaint," and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## II.

The Constitution grants the President the "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. Treaties, along with federal statutes and the Constitution itself, are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

Nevertheless, Dr. Retfalvi asserts that Article 26A is invalid because it violates the Origination Clause of the Constitution, art. 1, § 7, cl. 1. The Origination Clause provides that "All Bills for raising revenue" shall originate in the House of Representatives. In Dr. Retfalvi's view, Article 26A qualifies as a bill that raises revenue.

The taxpayer also contends that Article 26A violates the Taxing Clause of the Constitution, art. I, § 8, cl. 1. Under Dr. Retfalvi's reading of that Clause, Congress has the exclusive power to "lay and collect taxes."

In addition, Dr. Retfalvi maintains that Article 26A is not a self-executing treaty, and thus requires implementing language to validate it. As Dr. Retfalvi sees it, giving Article 26A legal effect absent implementing legislation unconstitutionally encroaches on congressional authority. And, Dr. Retfalvi contends that the IRS lacks statutory authority

8

to use its domestic enforcement authorities to collect a foreign assessment on behalf of Canada.

## A.

We first consider whether Article 26A violates the Origination Clause, which provides: "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with amendments as on other Bills." U.S. Const. art. I, § 7, cl. 1.

The Supreme Court has not precisely defined a "Bill[] for raising Revenue." The Court has warned that "[w]hat bills belong to that class is a question of such magnitude and importance that it is the part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject." *Twin City Nat. Bank of New Brighton v. Nebecker*, 167 U.S. 196, 202 (1897). Indeed, the Supreme Court has never found a law in violation of the Origination Clause. *Sissel v. U.S. Dep't of Health & Human Servs.*, 799 F.3d 1035, 1036, 1042 (D.C. Cir. 2015) (opinion on denial of rehearing).

The Supreme Court has, however, confined the scope of the Origination Clause. Adopting the interpretation of Justice Joseph Story, the Court has concluded that the Clause applies only to "bills that levy taxes, in the strict sense of the word." *Nebecker*, 167 U.S. at 202 (citing 2 J. Story, *Commentaries on the Constitution* § 877 (1833)); *see also Millard v. Roberts*, 202 U.S. 429, 436 (1906). Conversely, it does not apply to "bills for other purposes which may incidentally create revenue." *Nebecker*, 167 U.S. at 202.

Therefore, a law does not fall within the Origination Clause if it raises revenue for a specific purpose instead of the obligations of government generally. For example, in

9

*United States v. Munoz-Flores*, 495 U.S. 385 (1990), a law imposing a "special assessment" on anyone convicted of a federal misdemeanor did not violate the Origination Clause because the assessment was allocated to the Crime Victims' Fund. Similarly, a fee imposed on banks for the purpose of supporting a national currency did not violate the Origination Clause. *Nebecker*, 167 U.S. at 203.

Even if a bill funds the government generally, however, it will not be subject to the Origination Clause if it raises revenue through means other than the levying of taxes. In *United States v. Norton*, 91 U.S. 566, 568 (1875), the Supreme Court cited "the proceeds of the public lands, those arising from the sale of public securities, [and] the receipts of the Patent Office in excess of its expenditures" as examples of laws that generate revenue but are not revenue laws. *See also* Story § 877 (rejecting the view that "the bills for establishing the post-office, and the mint, and regulating the value of foreign coin" are subject to the Origination Clause).

Dr. Retfalvi reads the Origination Clause broadly to cover not only laws raising, lowering, or creating taxes, but also laws "relating to" taxes. He rests this argument on a mistaken reading of *Armstrong v. United States*, 759 F.2d 1378, 1381 (9th Cir. 1985). In that case, the Ninth Circuit considered whether a "bill for raising revenue" must originate from a House bill that increases taxes, or whether it may instead originate from a House bill that decreases taxes. Armstrong, a taxpayer, challenged the constitutionality of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, under the Origination Clause. The challenged statute was first introduced in the House where it would have reduced revenue by one billion dollars over a five-year period. However, the

10

Senate replaced the entire bill, except its enacting clause. The Senate's amended bill was estimated to increase taxes by about $100 billion over a three-year period. Armstrong maintained that because the House bill did not increase revenue, TEFRA only became a revenue *raising* bill after the Senate amended it. *Id.* at 1381. Therefore, in Armstrong's view, TEFRA did not originate in the House and was unconstitutional.

But, the Ninth Circuit rejected this argument. It reasoned that the "term 'Bills for raising Revenue' does not refer only to laws *increasing* taxes, but instead refers in general to all laws *relating to* taxes." *Id.* at 1381 (emphases in original). Citing this lone sentence, Dr. Retfalvi insists that the Origination Clause "pertains to taxes generally and not just laws raising taxes."

We discern no basis for such a reading. In context, the sentence in *Armstrong*, referenced above, merely rejected the taxpayer's argument that "raising" revenue was the same as "increasing" revenue. Moreover, the *Armstrong* Court cited three other opinions addressing the same Origination Clause challenge, none of which support Dr. Retfalvi's capacious reading of the Origination Clause. *See Wardell v. United States*, 757 F.2d 203, 205 (8th Cir. 1985) (per curiam); *Heitman v. United States*, 753 F.2d 33, 35 (6th Cir. 1984); *Rowe v. United States*, 583 F. Supp. 1516, 1519 (D. Del.), *aff'd mem.*, 749 F.2d 27 (3d Cir. 1984).

In *Wardell*, cited by *Armstrong*, the Eighth Circuit said, 757 F.2d at 205: "We cannot agree that 'revenue-raising' means only bills that increase taxes. Although the bill was dramatically altered by amendment in the upper house of Congress, it remained a revenue bill, regardless whether it raised taxes or lowered them." There is no indication that the

11

Ninth Circuit in *Armstrong* intended to create a significant shift in the doctrine through the isolated sentence on which Dr. Retfalvi relies.

The purpose of the Origination Clause, as evidenced by the constitutional history, supports the narrow reading of the Origination Clause first adopted by the Supreme Court in *Nebecker*, 167 U.S. at 202 (concluding the Origination Clause applies only to "bills that levy taxes, in the strict sense of the word."). The Founders did not intend for the Origination Clause to apply to tax administration, enforcement, and any other issue related to taxes. Rather, they intended the Clause to ensure democratic accountability in the imposition of taxes.

At the Constitutional Convention, several delegates were persuaded by George Mason's argument that "the 1st branch [the House] would be the immediate representatives of the people, the 2nd [the Senate] would not. Should the latter have the power of giving away the people's money, they might soon forget the source from whence they received it. We might soon have an Aristocracy." Priscilla H. M. Zotti & Nicholas M. Schmitz, *The Origination Clause: Meaning, Precedent, and Theory from the 12th to 21st Century*, 3 Brit. J. Am. Legal Stud. 71, 95 (2014) (quoting James Madison, *Notes on Debates in the Federal Convention of 1787*, 250 (1969)). As Justice Story explained, the House of Representatives possessed "more ample means of local information" than the Senate. Story, *supra*, § 873. Further, because the House of Representatives was viewed as more accountable to the people, it would "be more watchful and cautious *in the imposition of taxes*, than a body,

12

which emanates exclusively from the states in their sovereign political capacity." *Id.* (emphasis added).[2]

Similarly, the Founders relied on the Origination Clause to ensure that the taxes imposed on small and large states were balanced. At the Constitutional Convention, during debates on an earlier version of the Origination Clause, Benjamin Franklin claimed that the Clause would ensure that Congress did not impose a disproportionate tax burden on the large states. He argued: "[I]n all laws for supplying [the] Treasury, the Delegates of the several States shall have suffrage in proportion to the Sums which their respective States do actually contribute to the Treasury." Zotti & Schmitz, *supra*, at 93 (quoting Madison, *supra*, at 226-27).

Many years later, Justice Story echoed this sentiment while discussing the right of the Senate to amend revenue bills. He explained that the small states need protection "from the overwhelming representation of some of the large states," which might impose taxes that "would bear with peculiar severity upon the interests, either agricultural, commercial, or manufacturing" of the small states. Story, *supra*, § 873.

Plainly put, the phrase "bills for raising Revenue" refers to bills that impose taxes for the general support of the federal government and not the administration of taxes. Article 26A does not levy taxes. Nor does it impose a new tax or increase, decrease, or modify an existing one. It simply allows the United States and Canada "to assist each other

---

[2] Senators were not directly elected until the ratification of the Seventeenth Amendment in 1913.

in the collection of unpaid and overdue tax debts that have already been finally determined under their respective laws." *Id.* at 38.

We agree with the government that Article 26A merely facilitates collection of an already existing debt. *Id.* Moreover, to the extent that the law generates additional revenue, it does so through the collection of unpaid taxes owed pursuant to laws that originated in the House as bills for revenue raising. As the government puts it, "bills for raising revenue create the debt that a taxpayer owes, while provisions like Article 26A merely collect that already existing debt."

**B.**

Dr. Retfalvi asserts that the Taxing Clause of the Constitution grants Congress the exclusive power to impose taxes. The Taxing Clause provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises[.]" U.S. Const. art. I, § 8, cl. 1. Although Article 26A was ratified by the Senate, it is not legislation enacted by both houses of Congress. Therefore, Dr. Retfalvi maintains that Article 26A infringes on the Taxing Clause.

Article I, § 8 explicitly confers on Congress the powers delineated in the Clause. However, appellant misapprehends the scope of the provision; the grant of power is not exclusive to Congress alone.

In *Edwards v. Carter*, 580 F.2d 1055, 1058 (D.C. Cir. 1978), the D.C. Circuit concluded that the same authorizing language in the Property Clause ("The Congress shall have power . . .") was not an exclusive grant of power to Congress. The court reasoned that the "'mere fact . . . that a congressional power exists does not mean that the power is

14

exclusive so as to preclude the making of a self-executing treaty within the area of that power.'" *Edwards*, 580 F.2d at 1058 (quoting ALI Restatement of Foreign Relations Law (2d), § 141, at 435 (1965)). Article I states that "Congress shall have power . . . ," not that "Only Congress shall have power." *Edwards*, 580 F.2d at 1058.

Dr. Retfalvi cites three cases in support of his claim that the taxing power is exclusive, but none of them are persuasive. *See Downes v. Bidwell*, 182 U.S. 244, 370 (1901) (Fuller, C.J., dissenting) ("And it certainly cannot be admitted that the power of Congress to lay and collect taxes and duties can be curtailed by an arrangement made with a foreign nation by the President and two thirds of a quorum of the Senate."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (Douglass, W. concurring) ("The President has no power to raise revenues. That power is in the Congress by Article I, Section 8 of the Constitution."); *Youngstown*, 343 U.S. at 643 (Jackson, R. concurring) ("Congress alone controls the raising of revenues . . . .").

Chief Justice Fuller's dissent in *Downes* simply restated that a treaty cannot constrain Congress's power to tax. And while true enough, Congress's power is in no way "curtailed" by Article 26A. In *Youngstown*, the Court considered the constitutionality of President Truman's seizure of steel mills. The two concurring opinions addressed only the President's power to tax by executive order. Neither opinion addresses treaties, which, unlike executive orders, are given effect only after ratification by the Senate.

To be sure, the Constitution contains provisions that expressly grant some powers to Congress alone. The Framers knew how to limit particular powers to Congress when they so intended. For example, only Congress can authorize federal expenditures. *See* U.S.

15

Const. art. I, § 9, cl. 7. Only Congress may permit an officeholder to accept an emolument from a foreign power. *Id.* art. I, § 9, cl. 8. And, only Congress may consent to a state imposing duties on imports or exports. *Id.* art. I, § 10, cl. 2.[3]

However, the Taxing Clause is not an exclusive grant of power to Congress. Therefore, Article 26A does not violate the Taxing Clause.

## C.

Dr. Retfalvi maintains that because Article 26A is subject to both the Origination Clause and the Taxing Clause, it requires House-originated implementing legislation. We disagree.

A self-executing treaty provision is "'equivalent to an act of the legislature.'" *Medellin*, 552 U.S. at 505 (quoting *Foster*, 27 U.S. at 314). However, a treaty is not self-executing if (i) its text manifests an intention that implementing language is necessary; (ii) the Senate in giving consent, or Congress by resolution, requires implementing legislation; or (iii) implementing legislation is constitutionally required. Restatement (Third) of Foreign Relations Law § 111 (1987).

---

[3] The government suggests that the power to raise revenue also is exclusive to Congress, by virtue of the Origination Clause, so that the treaty power may not be used to impose a tax. *See Edwards*, 850 F.2d at 1070 ("[I]n a treaty the Executive cannot obviate these [Origination Clause] provisions by levying taxes or appropriating money from the United States Treasury."). The district court appears to have disagreed, holding that treaties, because they are not "bills," do not implicate the Origination Clause at all. We need not resolve that issue here. In any event, and as discussed above, Article 26A falls outside the Origination Clause because it is not a provision for "raising revenue."

16

Article 26A relies on each country's existing tax laws and procedures for assessment and collection. And, it requires no additional legislation to operate effectively. Further, there is no claim that implementing language is required by the text of Article 26A, nor that such language was required by the Senate when it ratified Protocol 3. As discussed, Article 26A is not subject to the Origination Clause. Nor does it infringe upon an exclusive congressional power. It follows that it does not require implementing language.

**D.**

Dr. Retfalvi maintains that the district court incorrectly concluded that, pursuant to Article 26A, the IRS may rely on its authority under I.R.C. §§ 6201, 6301 to collect an assessment for Canada. In his view, the IRS can collect taxes only if authorized under the Tax Code. Therefore, he insists that the IRS cannot make an assessment for the taxes of Canada. Dr. Retfalvi's cramped reading of the Tax Code is unavailing.

Sections 6201 and 6301 of the Tax Code provide the IRS with the authority and the tools to collect taxes and assessments. Section 6201 authorizes and requires the IRS "to make the inquiries, determinations, and assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title, or accruing under any former internal revenue law, which have not been duly paid by stamp at the time and in the manner provided by law." And, § 6301 requires the IRS to "collect the taxes imposed by the internal revenue laws."

Courts construe treaties "liberally to give effect to the purpose which animates" them. *Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 163 (1940). When a self-executing treaty and a statute address the same matter, courts must "endeavor to construe

17

them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other[.]" *Whitney v. Robertson*, 124 U.S. 190, 194 (1888); *see ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 388 (4th Cir. 2012); *Kofa v. U.S. Immigration & Naturalization Serv.*, 60 F.3d 1084, 1090 (4th Cir. 1995) (en banc).

The Court need not strain to harmonize Article 26A with I.R.C. §§ 6201, 6301. Article 26A authorizes that IRS to employ the procedures created under I.R.C. §§ 6201, 6301 to pursue and collect Canadian revenue claims. Article 26A states that a revenue claim "shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes." That is, if the United States accepts a request from Canada to collect a revenue claim, the United States must collect the revenue claim as if it were its own revenue claim.

Other circuits have recognized the IRS's authority under other tax treaties to use domestic enforcement mechanisms to pursue foreign tax liabilities. For example, in *Lidas, Inc. v. United States*, 238 F.3d 1076, 1081 (9th Cir. 2001), the Ninth Circuit considered a tax treaty between the United States and France, by which the United States was required to "obtain the information to which the [French] request relates in the same manner and to the same extent as if its own taxation were involved." *Id.* at 1081 (quoting Article 27-4(a) of Article 27 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, Aug. 31, 1994, U.S.-Fr., S. Treaty Doc. No. 103-32).

18

When the IRS subpoenaed a taxpayer in pursuit of a French tax liability, the taxpayer challenged the subpoena, arguing that the Tax Code did not authorize the issuance of subpoenas to obtain information pertaining to foreign tax liabilities. Rejecting the argument, the court concluded that, "[u]pon its ratification, the Treaty became part of the law of the United States" and thereby bound the IRS to "employ the same procedures to obtain information requested by France pursuant to the Treaty as it would employ in the investigation of a domestic tax liability." *Lidas*, 238 F.3d at 1081; *see also United States v. A.L. Burbank & Co., Ltd.*, 525 F.2d 9 (2d Cir. 1975) (holding that under a tax treaty the IRS can issue summons to obtain information on foreign tax liabilities).

It follows that here, too, the IRS can use its domestic assessment authority in pursuit of the collection of a liability owed by a taxpayer to Canada.

### III.

For the reasons set forth above, we affirm the judgment of the district court.

*AFFIRMED*